Towing v. City of Renton You know, I think that 10 minutes to the side would be plenty. Okay. Mr. Beckerman. Good morning, Your Honor. My name is Robert Beckerman. I represent Skyway Towing. My client is here in the first row behind the bench. His name is Dick Christensen. May it please the Court. This case, before we get into the technical aspects, is a case concerning regulation by a city police department of private impound without any rules. It is a regulation based upon the letter that was sent to my client indicating that before an impound took place, for a private impound, that they call the police and therefore delay the proper private impound to remove the vehicle from obstructing the property of the complained property owner. And I'm still having trouble understanding how this could possibly be a regulation. It certainly wasn't a rule of general applicability. I assume your client now is not calling the police department before towing. So there's no ordinance of general applicability on the book that's applicable to your client. How can this be an ordinance or a regulation? It's a rule. I looked at the statute, and the statute talks about private impound and public impound under Title 46. And the rule interferes with the procedure that is announced in RCW 49 4655-100. It says that the tow company is only required to notify the police at the time of impound. And now we get to the technical aspect of the case. What is an impound and when does an impound take place? Because under the statute 46 55-100, the tow operator is required to notify the police officer at the time of impound. Well, impound is defined in the statute under definitions as to What does your contract say? We don't have a contract. We have a general understanding. You had a contract that was terminated. What does that contract say? The contract doesn't define when impound takes place. It didn't define this rule. I didn't hear that. The contract, if I can find it in the record, either party could terminate the contract by giving 30 days notice. That's right. Well, the court didn't find that in its order. It said that the contract continued. So that wasn't the issue. The issue was Well, it continues on from the October 2003 date that it otherwise would have terminated, but then the city did give your client 30 days notice or 38 days notice, and under the terms of the carryover contract, that was it. Our position is that if the police department did a notice of termination based upon 30 days notice but did it for a wrongful reason, such as in contrast to the Washington State title on more vehicles than the regulation, that the laws should be uniform, then that termination is improper. Well, doesn't it say terminate without cause? I'm sorry. Doesn't the contract with your client say that either side can terminate without cause on 30 days notice? That's right. It does say that. I'm just curious. What's the problem with your client calling the police department? We illustrated that in the complaint and in the declaration. The problem, the realistic logical problem is that this business of tow trucks going around and hauling cars away that's not the issue that we have. I know that, but it's a highly regulated business by California. I think it's in the state of Washington and some other states in the 9th Circuit. You can't just go around and see a vehicle that's parked in the wrong place and tow it away. That's correct. You get a call from the owner. And written instructions from the owner. That's not the problem we have here. I know that. It's highly regulated. The police ask that before you haul it away just give us a call. They can check that in a minute and see whether it's a stolen vehicle or not. The problem that we had was that besides it not being in uniformity with the Washington state law was that it caused our client's tow truck to be out on the scene while the police ran its records, came out to the scene, and then when it came out to the scene on this private impound, they would rotate the next eligible tow truck company to the impound. We would be out there on our client's property and the client is most interested in getting the abandoned car out of the property and we're waiting there for the police to come and then when the police come they do their whatever kind of cursory inspection and then they call Pete's towing. What if that car or vehicle was a stolen vehicle parked on your yard? You could come up and haul it away? Without notifying the police about anything? I'm sorry? Without notifying the police about anything? Suppose there was an automobile that was stolen parked on Joe Smith's lawn and Joe Smith called you up and said haul it away. You don't think that law requires a little bit more than we do to you on your behalf? Washington state law doesn't require that. Washington state law requires that there be a sign in certain circumstances indicating that if your car is there without permission it will be towed away. Other instances such as in my driveway, if somebody parked their car, I wouldn't have to have a sign. In other words, you are towing away stolen vehicles? We don't know that the car is stolen until after it's been notified. But why wouldn't you want to know? Why wouldn't you want to conduct a business above board and let everybody know what you're doing? What's wrong with that? Are we talking about me as a private property owner or as a tow truck? My client as a tow truck company has clients like grocery stores with parking lots and maybe a baseball stadium. And if there's a car that's blocking people from coming and going, my client wants to have the car removed. My client does not understand when to wait for the police to come out there and have the car determined whether it's stolen or not. And then certainly doesn't understand when the police send us away and bring another tow truck company out to remove the car. You don't have any competition in the city? Do you? In Rankin, there are four or five different car tow companies that are on the rotational list. And they're all bound by the same rules? Excuse me? And they're all bound by the same rules? That's not clear. In fact, we had in the deposition of the police chief at the time on page 156 of the materials, the rule is articulated only in a letter addressed to our client's company. And when we asked further whether the other tow truck companies had received that letter, they said no. It's not in the Rankin Municipal Code. In fact, the Rankin Municipal Code talks about the definition of empowerment, which is what I thought we would get to. And the definition of empowerment is squares within our determination about how the state law should apply. Empowerment is the taking and pulling to a yard abandoned vehicles. And if the vehicle is taken to the yard, and then there's a call to determine whether it's stolen, there's a stolen report. Take and pull the vehicle in legal custody. And the city interprets that with some support from the statute as being whether you've taken dominion over the vehicle by hooking it up to the tow truck. So that seems to be at least as reasonable an interpretation. I'm not sure I heard everything that you said, but the Rankin ordinance defines in 10.51 empowerment as the removal of a vehicle to a storage facility either by an officer or authorized agent of the Rankin Police Department or by an approved towing company for towing and storage in response to a request from an officer or authorized agent of the Rankin Police Department. And the Washington state statute 4655-100 says that at the time of empowerment we are to call the police. And that's what we do at the impoundment. We don't call it before it's hooked up because there is oftentimes an urgent need to have the abandoned vehicle removed from blocking traffic or access to the property. And we don't call up after it's been hooked onto the truck and before it's been hauled away because there may be some security issues involved. We do it at the time of the impoundment. And the impoundment in the Rankin Code is after it's been brought back to the storage facility. I did a little bit of research and Seattle has the same definition. The impoundment under the Seattle Municipal Code is the removal of a vehicle to a storage facility by request of any person except the vehicle's registered owner or owner. What we're asking the court to do is to separate out the private impoundment from the public impoundment. There's no question that Skyway has done public impoundments appropriately. The question is whether a rule that seems to have only been addressed towards Skyway can be used to punish them for access to public impoundment. And where the contract has been terminated based upon a rule that's contrary to the Uniform State Statute on vehicles. Then we believe that the court should not enforce that rule. Thank you, Your Honor. Let's say it's a stadium. That would be private impoundment. At the stadium, that would be private impoundment. The stadium may have been too loose in the example that I gave, but there are maybe some instances from public parking grounds that are administered by private firms. Maybe think of high schools or something like that. Those private firms that operate parking on the state property, your client has an exclusive agreement with them? No. We don't have any agreement with Renton, but at one time with the city of Renton, there were four or five different companies. I'm sure counsel will be able to give you the names of the other companies. I have them in my materials. There is Gene Mayer and Roscoe and Bankers. They were approved towing companies. On page 156, we asked the police chief what procedures were outlined to the other companies concerning this notification. They indicated there was no letter of agreement. No procedures were outlined in those letters to those other companies. Why don't we hear from the city? Thank you, Your Honor. Good morning. I'm the assistant city attorney for the city of Renton. Can you hear me, Your Honor? What did you say? I noticed you spoke to the other counsel. I want to make sure you can hear me. You are projecting your voice very well. Thank you. I would like to begin my comments with where counsel left off. In the record, page 324, our former chief, Chief Anderson, testified that in at least 2005, Bankers towing, Gene Mayer towing, and Roscoe towing were on the rotational list at that time of his declaration. At that time, we had eight entities that were approved towing companies, one of which, interestingly enough, was Skyway Towing. A couple of things that I'd like to address that were raised... Why is that interesting? I'm sorry? Why is that interesting? Well, throughout this case, Skyway Towing has argued that if we're an approved towing company, we're automatically on the list. We have regularly argued, whether it's in briefing or today, we will argue that just by being an approved towing company doesn't mean you automatically get a contract with the city to be on the rotational list. I think it's a little ironic that just because Skyway Towing is an approved towing company that they're not also on the rotational list. What are the requirements that the city have for contracting with a towing company? The first requirement would be, of course, that they have to be an approved towing company. Thereafter, they have to agree to certain terms in addition to following state law. How much insurance must they carry? Insurance... Let me go to the actual contract. It's at page, I believe, 98-99 of the record. It'll set out all of the various terms. Not only do they have to follow the state law, but it talks about how we will logistically do the rotational list. State law governs them all. Absolutely. That's correct. Or maybe there are regulations and procedures that, as the court has already identified, this is a highly regulated industry. Why are you trying to run this outfit out of business? I'm sorry? I said, why are you trying to run this outfit out of business? We're not trying to run him out of business. He is still operating in our city as we speak. And he's not notifying us of stolen vehicles until after it's in the tow yard. The thing that we are asking of them is that they notify us before they actually take off with a stolen vehicle. And I would submit to the court that that is consistent with state law. We have, in the record, in a number of locations, but most easily, I can refer to the appendix of the city's brief. 4655-100 cited by opposing counsel says, at the time of impoundment, the registered tow truck operator providing the service shall give immediate notification. There shan't be a delay. It must be immediate. And I think we can reconcile, well, I don't think there's any reconciliation needed. It's consistent with a provision in the next section, 4655-200, where it talks about penalties for violation of this code. A registered tow truck operator may have their license denied, suspended, or revoked, may end up paying a penalty of a civil nature, whenever the director, and I'm presuming that that's a director overseeing the industry, has reason to believe the licensee has committed or is at the time committing a violation of this chapter. Subsection 6, found at A3 of our brief, subsection 6 says selling, disposing of, or having in his possession, without notifying law enforcement officials, a vehicle that he knows or has reason to know has been stolen. So as soon as that person hooks up this vehicle, heaven knows, once a car is hooked up to a tow truck, if the owner comes along with key in hand, there's no way that owner is going to be able to drive away with that car. But as soon as the tow truck driver drives away with that car hooked up to the vehicle, there's no question that truck and that driver is in possession of that stolen vehicle. The law says it must be immediate notice, and the law says that they can be fined, they can even lose their license if they have in their possession a stolen vehicle when they should have known that it was stolen. In the instance case, we have a situation where the people at Skyway Towing actually proposed the solution to this problem. They proposed that they use the IBIS system, the Vehicle Identification Program, which we have in this state and I suspect in other states as well. They proposed that they could run the vehicles before towing them, before hooking them up, before towing them. That was their suggestion. We took them up on it. Once we took them up on it, they discovered we don't really like doing this, and so they stopped. That notwithstanding, we honored the contract through to the end, and the lower court found it even extended beyond the actual termination date of the written document and went into November and December. That notwithstanding, we gave 38 days notice, which is permitted under the terms of the contract. We gave 38 days notice. Either party can give that notice, and we did. Counsel has suggested in his briefing that because we gave reasons and because we had reasons for terminating, that we somehow mutated, that this termination somehow mutated from a 38 days notice situation, which is you don't have to have a reason at all, to a for-cause reason, which would necessitate a hearing and due process and the like. And we're saying, well, we didn't terminate for the reasons identified in the contract. There are certain reasons, and we don't have those. We have others, and so we're giving you 38 days notice. If a towing company towed away a stolen vehicle from a supermarket or parking lot, would the city of Reston charge them with possessing a stolen vehicle? It's not likely in candor. Would it violate the law? Would there be a criminal law violation? I don't think it's a criminal violation. I think it's a civil violation. Possessing a stolen vehicle? Possessing stolen property? Is that criminal? I think that the towing statute makes it a civil violation, but I'm not clear. But by the same token, in candor, I don't think we would hurry up and call the director and say, hey, you've got... That wasn't my question. I understand. I don't think the statute makes it a crime for a tow company to possess the stolen vehicle and not notify law enforcement. I think at the minimum, it's a civil violation and subject them to what makes it a crime. Well, the towing companies at the scene are ready to tow away a vehicle. What the city would like them to do is to call the police and identify the vehicle. And how long does it take the police to come back with the information that it's stolen? It isn't necessarily a call to the police that reveals the information that it's stolen. It can be done within minutes through the IBIPS system. And Skyway, at least was at the time, they claimed, to be a subscriber of the IBIPS system. And they can get that information within minutes. To further answer your question, we cannot... Not all of the cars that are being impounded by Skyway are impounded within Renton's boundaries. Sometimes they're being impounded in the county, unincorporated King County. And they would have to then notify the King County Sheriff's Office of their recovering a stolen vehicle. And I can't speak to how long that... Well, they do that after it's towed to the impoundment location. Their current practice is to do this after they have towed it to the yard. That is correct. We are asking, as consideration for being put on the rotational list, that they do that before they hook the car up. Before they take it to the yard. Well, they find out that it's stolen. They run that system. Then what happens? A number of things could happen. If the car is needed for evidentiary purposes, the jurisdiction that took the stolen or that is investigating the crime that gave rise to the need for the vehicle would make a decision about where the vehicle should be stored. It could be stored at Skyway. It could be stored at an evidence yard. More likely it will be an evidence yard for chain of custody issues. It would depend on a case-by-case basis as to where that car would end up. All right. So then if it's decided that the car should be taken, who takes it to the evidence yard? There again, it depends on which agency is doing the ask. I can't speak to other agencies, but I'll speak for Renton. In the case of Renton, there was an agreement between my understanding, and this is not in the record, but my understanding is there was an agreement that Renton would allow Skyway to finish the tow. So, in fact, if it was Skyway, then it would be Skyway finishing the tow. Which means what? I'm not sure I understand. It would depend again on, for example, if it's a homicide and the car was somehow linked to a homicide, we would need guidance from the King County Prosecutor's Office as to where they wanted that vehicle to go. If it goes to a tow yard or to an evidence yard. And as I say, in Tender, I think it's more likely going to an evidence yard because of chain of custody issues. Depending on what we need from, what the prosecutor needs from the vehicle. Then how is it that another company can be rotated in? That can happen. I guess it could happen if the police officer called the dispatch. The rotational list is overseen by the dispatch entity. We call it Valley Communications. Valley Com then looks at the list to see who's next. If the officer calls Valley Com for the next name on the rotational list, that's what's going to happen. The officer does not have to call to get another name. Skyway is right there. Yes, exactly. They may call someone else to do it. Do the towing? If in fact the car owner for example has someone else that they want to tow the vehicle. Forget about the car. We're talking about a murder vehicle that you just brought up. I can't speak to what is going to face an officer. I know it can happen that another entity is called. It can also happen that Skyway completes the tow. When do you bring in another towing company? I don't know what the reasons would be as I stand here. I cannot answer that question. Don't you think that's important to know? When I listen to the argument of counsel, it almost sounded like Skyway is there. They're either hooked up or ready to hook up. They've set their equipment there. There's a big delay and they have to wait. The police come out to the scene. Then Skyway, you're off of this. We're taking the next rotation. Why would they do that? Would that be a violation of the contract? Could you answer that? I don't know that it would be. If I may turn my attention to this. Really, in honesty, I don't think I can answer your question. I might be able to answer yours. I don't think it's a violation of the contract because the contract specifically says that we will go off the rotational list. To the degree that it is a we don't care about Skyway message, I can certainly see that that is what could be communicated. I can't answer under what circumstances the officers would call for a different tow company. But had they done that and Skyway didn't like that, they would be in a position to give a 30 days notice and terminate the contract with rent. That is correct. But you don't see this being a violation of that contract. I didn't see that language in there either. I'm over my time. I will ask that the court affirm. We won't tow you away. I'm really glad because I don't want to end up in a tow yard. It seems to me there is a breakdown in communication in the Renton Police Department. There is a lot going on between the police and the tow truck operators and the lawyers and all that. You know about that, don't you, in the real world. You have to have a system that is beyond reproach. I would think. Otherwise, something is happening. There is a case over there. Maybe there is potential for a fee or money and then they just maybe pick some tow truck operator they like. Who is then going to cooperate with someone else? I would agree with your Honor that the system should be above reproach. Unfortunately, we cannot be perfect. In the thousands of cars that Skyway tows every year, in terms of stolen vehicles or non-stolen vehicles, they have only identified a few complaints. I can't speak to why on those occasions things went awry. But by and large, by great large, things went properly. While I agree it should be above reproach, I have to concede it can't be perfect. That notwithstanding, I still ask that you affirm. Thank you. I could not identify in the record, but I can tell you that it is in the record that the policy of Renton was that if they removed the towing company from the private impound, turned it into a public impound because it was a stolen vehicle, they would remove Skyway. Skyway is still in state court. Excuse me? Why didn't you sue in state court? Your Honor, we did. You did? It got removed. I did want to mention one or two other things real briefly. Well, you were removed because you brought up Section 1983, positive action. That's right, Your Honor. In state court. The statute that the counsel was talking about under 4655-200 said it represented that removing a stolen vehicle would be a penalty, but it wouldn't be under... Well, you still have a state law claim? No. My records indicate that you didn't file in the state court. You filed directly in the federal district court. Your Honor, we filed in state court under the federal civil rights statute. And then what happened? And then the city removed us from state court to the federal court. I see. And then the summary judgment motion was only on the state law causes of action. And the contract. But I wanted to point out with RCW, I think I brought the wrong page up. So what do you have left in federal court? I have this appeal. The district court judge essentially gave us a motion to show cause why the rest of the case couldn't be dismissed. So we filed our motion for reconsideration based upon the preemption uniformly required under the RCW 46 title. And then the judge corrected his minuteness order with a minute and entry. I wanted to point out, and I don't think you'll be able to find it here, but 4655-200... It was granted on what claim? Federal or state claim? State. State claim. That's it. The federal claim was the compensation. What? The federal question that we had was getting damages and attorney's fees under the civil rights statute for wrongful action under the color of law. But I wanted, if I could, to draw your attention, if I can find my statute to 4655-200, which allows us to remove a car if we have the written authorization from the owner. So the question of whether the vehicle was stolen doesn't enter into our rights as a tow truck company to haul away a vehicle until the impoundment has taken place and the call to the police is required under the state law. The removal of the vehicle with the permission of the property owner that called for the private impoundment authorizes us to do it, and there would not be any reason that there would be any time site as a basis for filing criminal action against the tow truck company. Okay. I just wanted to mention, too, that there was no offer for a resolution of this case along the lines of what counsel said. There was no gesture by the city of Brenton saying that if you did a private impound and there was a report of a stolen vehicle, that we would let you continue with the impound. It would be a nice resolution to this case. It would help cement a working relationship with the tow truck company in the city of Brenton, but they had no interest in trying to resolve it. They wanted to muscle in on a requirement that was not imposed formally or informally for the other tow truck companies. Yeah, well, want this? I mean, is that offer still there on the table? If I may, Your Honor, that offer, I'm talking about something that happened before the lawsuit. Yeah, well, we can always go back. And I don't know that it's still there. I'm not authorized to make that representation at this time because, frankly, I didn't talk to my chief before I came here today about... Well, why don't you call the chief up now? We'll reset this case and maybe we can get it cleaned up, huh? I can do that. All right. All right. So the matter is submitted, but don't go away. All right. We'll go to the next case. Pagan versus McDonald. All right, let's go.  Take your time. You can fill up your cup with water and bring it over there. Water's good for you. Yeah, I know. We're in a nervous business. May it please the Court, my name is Wendy Holton. I represent the petitioner in this case, Bruce Pagan. I would like to reserve about seven minutes of my time for rebuttal, please. In 1994, Bruce Pagan was convicted by a jury of deliberate homicide and aggravated assault. He received a life sentence on the deliberate homicide count, and he received a consecutive 20-year sentence on the aggravated assault conviction. In this petition for relief pursuant to 28 U.S.C. 2254, he raises issues of the ineffectiveness of his trial counsel and his appellate counsel. A number of these issues have already been determined by lower courts to constitute deficient performance and that that deficient performance caused him prejudice. I think it's significant that regarding three of those issues, a separate one of each of those three issues relates to each of the three key witnesses in this case other than Pagan. Those issues are the failure to present impeaching testimony regarding the reputation of Jim Enger, who was involved in the aggravated assault charge for his propensity for violence, the failure to impeach Reece Cobean, who was the only sober witness to this whole event, with the fact that he had given inconsistent statements about where he was during this event, and the failure of Pagan's trial counsel to object to the comments of the prosecutor regarding Gabby Hagen's testimony and what the prosecutor did was refer to her prior invocation of her spousal privilege and the appellate counsel's failure to raise that in the initial appeal. In this case, relief has been granted by both the state and federal courts, but only on the aggravated assault conviction. In the state courts, they determined to run the aggravated assault conviction concurrently with the deliberate homicide conviction. The federal district court reversed that, reversed the conviction on the aggravated assault, finding that if there was enough prejudice to require a remedy, then that, by definition, undermined the jury's verdict. Why couldn't the state court decide to give a remedy of the state trial matter? But it made specific findings that this wasn't a deficiency that was going to affect the outcome, so that there wasn't a strickland error. Why couldn't the state court reach that conclusion? If you look at the findings, facts, and conclusions of law of the state district court, it's a whipsaw. This wasn't an effective assistance counsel. He could have done a better job. It was prejudice, but clearly not in a strickland sense, because the court goes on to make a finding that it didn't affect the outcome. Why wasn't the state court entitled to make that determination and then give a remedy under state law? I think it is permissible for a court to make a finding that there was deficient performance and that the defendant was prejudiced by that performance, but that it wasn't sufficient enough not to require a remedy. It wasn't sufficient enough to require a remedy. Here, the state district court, by definition, found that there was sufficient evidence or sufficient deficiency to require a remedy. Under state law, but it wasn't a Sixth Amendment violation. I would disagree with that because a finding of deficient performance and prejudice from that is, by definition, a Sixth Amendment issue, in my opinion. Only if it affects the outcome, that's what the Supreme Court has told us. If there's a reasonable probability that it affected the outcome, and I think it's important that that reasonable probability standard is less than a preponderance of the evidence. The state court specifically found that it did. That's my problem. I would respectfully disagree. You can say that there isn't enough prejudice to require a remedy, but once you decide that there is enough prejudice to require a remedy, then you've found, as the federal district court did, that there is prejudice enough to undermine confidence in the jury's verdict. I think that you can then move beyond there, as the federal district court did, to make an independent determination that there was, in fact, sufficient performance and sufficient prejudice to undermine confidence in the jury's verdict, going beyond what the state court said and to looking at the record in this case to say, wait a second, when you put this together and you look at these errors, one that goes to each of the state's key witnesses in this case, then you have to find that there was sufficient problems to go with the jury's verdict. How does that meet the ESPA standards? Because, of course, the district court is not making the determination the state court did. It's required to look under ESPA to see whether it was an unreasonable application. And that's exactly what the federal district court did, is to say this was an unreasonable determination of the facts in this case, given the circumstances of this case. It's our position in this appeal that under the facts of this case, that the federal district court's decision not to overturn the deliberate homicide conviction is both inconsistent and unreasonable under the circumstances. And that is because the self-defense defense went to both the aggravated assault conviction and the deliberate homicide conviction. In this regard, it's important that Montana's law of self-defense requires a jury determination on the issue of the reasonableness of the defendant's action. And it also requires a jury determination as to the reasonableness of the amount of force that the defendant used. In this case, it's particularly important that even a mistake of fact can be determined to be reasonable. And that's what's critical as it regards to Alice Goodrich. Clearly, she was an innocent person here. But the question is, was Ruth Hagen's perception of the situation, was that reasonable? And I think that that's especially important in light of his testimony, which was, when I heard somebody coming up the stairs and I saw this other set of legs, I thought it was a cohort of this person who was attacking me and who I'd been in this struggle with. So in order to split up the aggravated assault and the negligent homicide conviction, the magistrate judge had to, and did, invade the province of the jury by finding facts. And you see that at page 28 and also page 40 of his decision saying it was making the determination that it was unreasonable of the petitioner to then turn around and begin shooting without any indication of who was approaching him from behind or if they were attacking him. Where is that on page 28? Judge Erickson's big opinion, you can find that statement both at page 28 and page 40. What paragraph? Let me find it on page 28. It is the Last paragraph. Yes. And the other thing that's, I think, critical here is both the state and the federal court made the error of determining that it was an aggressor in order for Bruce to reasonably invoke the self-defense defense. And as I noted before, that's not the case. Even the state can get you there. The bottom line here is that the reasonableness of Hagan's belief on the need for the use of force, the crux of his self-defense claim goes to both counts. Here we have one continuous event, one trial, one jury deliberation. And the evidence here went to both charges. The critical element in the jury's determination is who they believe. Did they believe Hagan? Did they believe Hagan and his wife, Gabby, whose testimony in large part supported his version of events? Or did they believe Jim Enger and Reese Cobing? Under the circumstances of this case, credibility can't be parsed between the two charges. These events occurred seamlessly and rapidly, and they just can't be divided. And again, we go back to the problem that this really is a jury question. If the jury believed that Hagan believed he was being attacked by an unknown intruder, I think you can speculate that they would have acquitted on both counts. Or they could have acquitted on the aggravated assault count and said, but it was then unreasonable but merely negligent or mitigated to turn and shoot at the next person. If they knew that it was Jim Enger that he was struggling with, if they believed that he knew it was him. How could they find negligence when he comes to the door with a shotgun, loaded with two shells, and immediately starts shooting? How is that in the world? Is that negligent? I think you have to look at the background of what happened here. There were fires occurring around Bruce Hagan's property at this time. And he had been warned that some of the people on the fire crews were dangerous, and there were some other problems. And so to be very careful and cautious. He woke up, granted from a drunken stupor, and was to people who had been pounding and kicking on his door. He walked from the back bedroom to the front bedroom, grabbed his rifle along the way. He heard somebody say, open up. He said, who's there? Didn't realize who it was. Pulled the board out that they used to lock the door. Door slides open. I'm willing to speculate here, and again, this would be a jury issue, that what happened is Jim Enger did fall in the door. He saw Bruce Hagan with a gun. Grabbed the gun. Bruce didn't know who it was. And they ended up struggling for the gun, and then the rest is history. That's his story. And then the negligence would come that he didn't then pause and determine who the next person coming was. Again, that's a jury question. And regarding that issue of whether a negligence homicide instruction should have been given, one of the things that I think I... Negligence would be if he shoots at a bird and misses the bird without hitting somebody. But when you deliberately try to hit somebody with a rifle shell, how could that be negligence? Even if you're mistaken with the identity of the person. It's his state of mind. The whole thing here was, the whole issue here was Bruce Hagan's state of mind. He didn't deny the acts in this case, and that's why that's another one of the reasons why it could not have been a strategic decision not to ask for a negligence instruction. Bruce Hagan did not deny the acts. And so the whole jury question becomes, what is his motivation for doing this? And so he could just, regarding the aggravated assault conviction, there was never any argument that he should have requested a negligence assault instruction there. Counsel, can I ask you, unless you have another follow-up question, a question about your spousal privilege argument? In looking at that, it appears that the spousal privilege not to testify is a creature of Montana law. And the Montana Supreme Court, as I read their decision, said, well, as a matter of Montana law, there was no prosecutorial misconduct. Why are we just bound by that decision? It wasn't a Fifth Amendment privilege against self-incrimination. It was a state law issue. Because the violation and the comment on Gabby Hagan's invocation of her spousal privilege in the early stages of this was to try to undermine her credibility. There is a plethora of federal law saying that it is a violation to comment on someone's invocation of privilege. But this isn't a privilege against self-incrimination. This is just a state law spousal communication privilege. Why isn't that just a creature of state law, and we bow to the Montana Supreme Court's determination that, as a matter of state law, there was no prosecutorial misconduct? Because it was an unreasonable determination of the facts of this case that there was not a comment on her there wasn't a comment on her invocation of this. That was unreasonable. Can we, as a federal court, tell the Montana Supreme Court that it was wrong with its state law determination? When it becomes a matter of was a witness improperly impeached, which becomes a matter of due process, yes. So you're saying it's a due process issue, not a Strickland issue? The Strickland issue kind of merges seamlessly into a due process issue, because you've got to go the Strickland issue is, is there ineffective assistance of counsel? And then the due process issue is, what is the appropriate remedy? Strickland mandates that the remedy match the error. And whether or not the remedy matches the error doesn't go to the ineffective assistance of counsel, it goes to a due process issue, which goes to another one of the issues that has been raised by the state in this case, and that is that we didn't raise the due process issue  I believe. In your petition, you had raised the due process, but not Strickland. And in fact, I did have a question at that. Did petitioner ever make a motion, a Rufus team motion to amend their pleading? No, Your Honor, because we made exactly the same argument and presented exactly the same law in our state court briefing and our federal court briefing. And if you look at the petition, which only allowed me to allege facts, it alleges exactly these facts and it alleges that it was inconsistent of the courts to divide the remedy between the aggravated assault and the deliberate homicide. The exact same argument is made in both places. And I cite, I think that my briefing on that issue is, I believe, quite thorough If I may, I'd like to reserve my remaining time. Thank you. Please, the court. My name is Mark Fowler. I'm Assistant Attorney General for the State of Montana. Your Honors, the key issue that Petitioner's Counsel raised regarding the deliberate homicide is that there was a self-defense defense that included in tandem two self-defenses at one time. Now, it is the elemental principle of law under Strickland, Your Honors, and Strickland states it itself, that in determining what is prejudicial, in determining what evidence or proposed evidence could have been brought but for the errors of counsel, you look at the evidence that's actually you measure that, proposed evidence, against the evidence that was actually presented in trial. To submit to Your Honors, the evidence presented in trial does not allow for there to be now, as Petitioner's Counsel characterizes, this tandem self-defense. That was not what was argued. Defense counsel at trial, in opening and in closing, did not propound this theory. Yes, the facts were a stream of continuous facts that occurred that night in the cabin. The facts only show two attacks or two, what he believes are attacks, in succession. Two self-defense theories in succession. Mrs. Holton's testimony would be persuasive if there were facts to show that it was the intent of trial counsel, and if based upon primarily the testimony of Hoggett himself, if the facts showed that he was thinking it was, if you will, pardon this sports metaphor, a blitz. There were two people at one time. Or a full court press, if you will. That's a sports metaphor? This was a blitz. This was an attack. Oh, a blitz. A blitz. I thought you said an obelisk. An obelisk. You said it different. The facts don't allow this. There's suggestion by Mrs. Holton, just now, that Mr. Hoggett, about the time there was a struggle over a gun, perceived, and I don't miss Mrs. Holton necessarily inferred this or implied this, that Mr. Hoggett heard the footsteps of Alice come up before the struggle with Mr. Ingram. The facts show Mr. Hoggett testified to that when he opened the door there was an immediate fight over the gun. There was an immediate struggle for the gun. Now whether you call that an attack or not, it's debatable. It's highly debatable. But nevertheless, he struggled with the gun and depending on who's testimony, Mr. Ingram or Mr. Hoggett, Mr. Hoggett said he hit him with the gun and Mr. Ingram went down. Mr. Ingram testified he didn't actually go down, but he was kneeling over trying to recuperate. In any case, the next thing that happens is the shotgun goes off. Mr. Hoggett did not testify that he even was aware that he pulled the trigger. Clearly, incidentally, this is not even a self-defense. He does, he is aware that he admits shooting Mr. Ingram. He's not aware that he pulled the trigger. There's no basis to reason to believe that he was acting under any of the elements of the purview of self-defense in Montana. That's why the state maintains that under any of the issues of ineffective systems of counsel would not make a different result, even if the state for purposes of argument here concedes there was sufficient performance, which was, by the way, never expressly found by any state court a deficient performance under Strickland. You're saying even if there was a deficiency in not bringing evidence about Mr. Ingram's reputation for violence and even if there was prejudice with respect to that defense against the aggravated assault, there would be no prejudice with respect to the Alice Goodrich homicide. Well, clearly, strictly under Strickland, if you find a deficient problem and you find a prejudiced problem, there's constitutional error. What the state court found was that there was some level of error and there was some level of prejudice, but it didn't arise to the level of ineffective systems of counsel under Strickland. Why wouldn't there be prejudice if it were deficient to not allow any information about Mr. Ingram or bring up the information about Mr. Ingram's reputation for violence? If that was deficient, how could that not be prejudicial since it would affect his self-defense claim for Mr. Ingram, for the shooting of Mr. Ingram? First, primarily because of the cumulative. Gabby Hagen stated that defendants on witness said that she observed that the door opened and that Hagen pulled Mr. Ingram in. That evidence is still there. That doesn't go away. That's part of the trial record. It's a historic binding fact. Even with that evidence, that controversy, whatever evidence that could be done would arise out of impeaching Mr. Ingram's account. In any event, the evidence of reputation for violence would only go to one very strict issue under Montana law at the time, and that is the identity of the aggressor. Mr. Hagen already testified that Mr. Ingram attacked him. He was the aggressor. Additional evidence would be cumulative. It could be corroborated. Corroboration is not enough under some precedent in this court to find an ineffective system of counsel alone. It wouldn't make a difference. And you can be sure, if that evidence was brought in, that the state of mind of Mr. Hagen, as soon as Mr. Ingram went down from the shot, the next thing Mr. Hagen knew, and this is throughout the trial, this was argued, I believe, in open court,   the next thing Mr. Hagen knew, the next thing he saw were a pair of feet. A pair of feet that he assumed were a cohort companion. The term cohort companion is probably the strongest inference you're going to find in this record. This was a tandem assault. But there is nothing by Mr. Hagen that substantiates this theory that he believed this was sort of the same assault. Because what he actually says is, I would have shot anyone. I would have shot my own mother. He didn't know what he was doing. He admitted that Alice did not act aggressively. This is his testimony in trial, looking in hindsight. That she did not act aggressively. Again, historic binding fact from this trial states that. It can't be overcome by any additional evidence that Ms. Hulting is proposing should have come forward. But with respect to, I'm sorry to just return to this question, with respect to Mr. Enger and the aggravated assault charge, your argument that there wasn't prejudice for if there had been deficient performance for not raising this reputation for anger or for violence was because it was cumulative of Mr. Hagen's own testimony? Well, yes. It would prove that he was aggressive. It would tend to prove that he was the aggressor. And I think the prong is the defendant reasonably believes he was in imminent danger of unlawful harm. The law of self-defense in Montana at the time was, as a defendant, you cannot be the aggressor. It goes to that element. Three elements of self-defense in Montana at the time, Your Honor. The first prong, the first element is the defendant cannot be the aggressor. And that is what we're operating under on the Logan case, which refers to the Jones case from 1914, which is also talked about, and the Benton case from 1992. You cannot be the aggressor. Secondly, the second element is you reasonably believe you were facing imminent or severe bodily harm. The third element is you reasonably believe that the force you used was reasonable to react toward, to respond to the threat of imminent bodily harm. What we're saying in the prejudice analysis here, Your Honor, is even if that first element could conclusively be met with impeachment testimony that should have been brought, there is no way, under the facts of this case, that the other elements could be brought forth. And what Master Erickson has done is simply recognize that not making, just simply recognizing what the, in this court of statutes by Ms. Holton, page 28 or 38, the court has simply recognized there's no way a reasonable jury would find otherwise. I keep missing the last few words of your sentence. There's no way There's no way that a reasonable jury, no reasonable jury would find that Mr. Hagen has met all the elements of self-defense, even with the proposed evidence that Ms. Holton says should have been brought forth. And that's the evidence that this victim had a reputation of being a mean guy. Yes. Aggressive. Right. Yeah. But he didn't know it. He didn't know what. Mr. Hagen did not know who the intruder was. What you would have to do to, and you can be sure that the state would ask the jury not, ask the judge to instruct the jury that you cannot take this on mental state. The Benson case refers to that. It was before the trial. That is the law. It cannot be used for the mental state of the defendant in a self-defense case. It can only go to the identity of the aggressor. Wasn't there contradictory testimony, whether Mr. Hagen called Mr. Enger by name or not? Yes, Your Honor. That he may have known the identity? Two witnesses stated that. A cross-corroborating witness has stated that. The magistrate in this case said that the trial counsel was in effect prejudicially under Strickland because if both of those witnesses were impeached, then that evidence would never come in. Why would that evidence still produce, by reasonable probability, a different result given what Mr. Hagen has stated by his own testimony before the jury? And what Mr. Pavlovich stated to the jury in closing, although rhetorical vain admittedly, that what we call the line tens, Your Honor, means for people... But isn't that evidence that Hagen knew who the aggressor was? It is evidence. It is. It is evidence. So that's kind of important. So it didn't come from him, because he's kind of a stupor, huh? And these are very exciting events, and you know, you don't remember everything that happens, but he did call out the name. Yes. Yeah, he did call out the name. So that's certainly an indication that that must have arguably put great fear in his heart. And then he... The trigger was pulled, and the aggressor was wounded. And then what happened to Hagen after that? Fell on the floor? No, Inger fell on the floor. When he shot at the woman? Right. He fell on the floor. No, no, Inger fell on the floor. I don't believe the record, and Ms. Holt will probably correct me if I'm wrong, I do not believe Mr. Hagen fell on the floor after he knocked what he believed was the first intruder down on the floor. Yeah. And then he shot. The next thing he knew, he Then the next thing he knew were a pair of feet coming toward him. He heard something, and he shot. And he turned around, and he said, I wish I had anyone. I just reacted. I wish I had anyone. Well, isn't that relevant to the fact that he knew that this first victim was kind of an aggressive mean guy? That would have stirred up a lot of adrenaline in him, and then when he hears these feet, I mean, he's not thinking rationally. He thinks, well, they're ganging up on me, and then he fires. Would that have been relevant to a jury? Yes, sir. The error, the many errors the magistrate had committed in regards to the aggravated assault, overturning the aggravated assault, was never fully discussing Montana law and what the trial counsel misunderstood as the law. And in 1914, in the State v. Jones case, the Montana Supreme Court clearly states that when the identity of the aggressor is put in issue, the evidence of turbulence or violence of the character of the victim can be shown to resolve the identity of the aggressor. It does not say, however, that that evidence can be used for any other purpose, such as mental state of what the defendant knew. He still has to know to prove reasonable establishment of response that he knew the identity of the aggressor. I think what the Jones case states and the Loebian case states is, if there's an issue, who was the first aggressor under the first element of self-defense? Was it the defendant or was it the victim? In that case, and that's put in issue, then the evidence, the 404 evidence can come in, but only for that purpose. The state law clearly states that. And even if it did not state it, or somehow your honors find that a debatable theory, then trial counsel cannot be deficient for not using a debatable theory of law. I want to remind the Court that the evidence of the post-conviction hearing stated that the only thing Mr. Pavlovich stated, he did not testify, this is from the daughter, is that he said, the daughter said, or I asked about, Mr. Pavlovich, why won't you show the propensities for violence to Mr. Inger? And what Mr. Pavlovich said, that the judge might find that inappropriate, as he might, but there might be objections to it. And I didn't quite understand the Montana Supreme Court's ruling on that. What is the Montana law on that issue? Whether it would have been inappropriate to introduce that? Well, you can look directly to State v. Benton. In that case, in 1992, this was two years before the trial, the Court stated that evidence of reputation of a victim for violence and treatment can come in on the identity of the aggressor. However, in this case, so therefore, 404 and 405 have been met. So it could have been. It could have been. But in Benton, the Court said, we're not going to allow it, and we're going to uphold the trial court, because the trial court found that on other relevance grounds than 403, it wasn't sufficiently prerogative, and it was unduly prejudicial. So it could have been also objected to successfully. Right. Both were true. Can I just ask you, because I was confused about the Montana Supreme Court's ruling, Hagen testified, and there was some evidence that maybe Kendra Hagen also testified, that the trial counsel had said, I'm not going to investigate this because I don't think it's admissible. And the Supreme Court acknowledges that, but then goes on to say, but the record is silent as to why the trial counsel decided not to admit this evidence. Why was it that the Montana Supreme Court discounted the testimony of Mr. Hagen and his daughter? Your Honor, it doesn't go far enough to explain the tactical reasoning. If I may, if the Court's indulgent, this is the actual testimony of Kendra Hagen at the post-conviction, page 17 of the transcript. Ms. Hagen answers what were the words that Mr. Pavlovich used. He said, I think he said things like, maybe the judge won't allow it. So what the Supreme Court is saying is, there's not sufficient evidence of the tactical reasoning of Pavlovich on why he didn't think the Court would allow it. Is it 403? Is it 404 and 405B? Admittedly, it could have been 404 and 405B he was thinking about, but it could have also been 403 and 405B, and it was unduly prejudicial, that some of the crimes were remote. And, Your Honor, I see that my time is shortening, but I just want to say that the magistrate judge, in the manner in which he determined that the Richard issue on the aggregate assault came upon the issue of an inconsistency that he perceived in the manner in which the State conducted the analysis, the State was never given an opportunity to brief this. This was not an issue that was raised in the petition, as Ms. Holton correctly points out. It was raised in the State Court. It was raised in the brief after the State answered. But didn't the District Court give you an opportunity to reply to the additional briefing? It did, Your Honor. It did. And the State entered a notice in the Federal Court that it would rely upon the brief of the answer, because the State is entitled to rely upon the grounds that are raised in a petition. Ms. Holton talks about the form that's used in the civil rules procedure. That form is governed by some of the rules of habeas, some of the habeas rules, and one of those rules regarding the petition is that the petition must state the grounds that you're going to be relying upon. But the District Court can freely allow amendments to the petition. And that would have been the appropriate thing to do, is to allow a 15A amendment to a sponse, but please give the State the opportunity to be heard, Your Honor. It's a fundamental error in this case not to allow the State to be heard on this issue. They were allowed to be heard, and the District Court gave you the opportunity to reply. Your Honor, it is not unreasonable to assert that counsel, and I mean no disrespect to Ms. Holton, counsel should be expected to apply intellectual precision in the identification of claims up front. You cannot expect in a briefing, which is after the State has answered, in which the brief does not state that this is a continuation of or amendment of the petition, or that this could be considered as part of the petition incorporated by reference, the State has no identification up front of what the grounds are when that should be put in the petition. The rules of civil procedure are rife with examples, of how we've come so far from the exacting title of pleading that we used to do before. It's notice pleading. The petition is up front complaint on the identification of the grounds. Notice doesn't necessarily have to put the legal authorities, but the grounds have to be there. So if there are additional matters brought up and additional pleadings after the answer, it's outside the petition. And the least thing that the Magistrate should have done is at least give the State the opportunity to answer something that's finally something he arrived at, and not something that was ever raised in the petition. Did you ever ask him for that opportunity after he made his decision? No, Your Honor. After the writ was issued, we did not move for reconsideration. You didn't do that, but you could have done that. Arguably, yes, sir. What? Arguably, yes. You're correct. And... ... ... The State wasn't represented at the hearing on the habeas? The oral argument, sir? The oral argument on the habeas? Is that what you're referring to? Yeah. I guess, but that issue was not brought up in oral argument. Okay. Thank you. Thank you very much. ... A few brief points. Regarding Gabby Hagen's testimony, her testimony was that I saw Jim Enger fall into the door. She said it was like Bruce yanked him in, but she said she didn't see it. So, that is... Her testimony on that point is not conclusive, but Bruce was the aggressor. The reason that... The State spent a lot of time asserting that trial counsel didn't raise the self-defense as to both counts, but I would refer the Court to the entire trial and to particularly some of the things that he said in closing. On Trial Transcript 4, at the beginning of the hearing, he said, but Mr. Hagen had just been involved with what he thought to be a struggle for his life. He just shot a man. He was trying to determine what was going on, and then through the door, he said, comes a figure, a figure that he doesn't recognize. Was she armed? I don't know. Was she bigger than him? Didn't take time to notice, but the fact is, when he shot her, she was 5 to 7 feet away from... 5 to 7 feet, according to the forensic evidence, from the muzzle of that gun. He didn't take a lot of time to calculate what the odds were. He wasn't engaged in, you know, a high school wrestling match. Well, you know, you're talking very fast. Picking up everything you say. Okay. Well, I'll move on. He's tending it to be in Morris code. I'm sorry, Your Honor. One of the final things that defense counsel says in his closing at page 140 is, I'm not contending that Bruce Hagan is innocent. I am contending here that Bruce Hagan is innocent by virtue of self-defense of the crime for which he has been charged. I'm saying that when the events of that evening happened, he was frantic. He was afraid for his life. He may have been mistaken, but any one of us may have been similarly mistaken under the circumstances. The mistake was a reasonable one, although it's odd to apply the word reasonable to a serious event like this. And the prosecutor in his closing also recognized that the self-defense went to both charges. The prosecutor said in his closing, if I can find it. That is referred to in my brief. But the reason that the self-defense goes to the homicide of Alice Goodrich is because Bruce Hagan thought he was under siege. And the reasonableness of that belief was a jury question. Okay. I think we understand, Your Honor. Going on to the failure to present evidence regarding anger. The only evidence in this record is that that evidence didn't come in because trial counsel didn't understand the law. And a tactical choice cannot be made on a misunderstanding of the law. Matt Tavlitch, the trial counsel, did not understand that reputation for violence could come in. And reputation for violence could come in, in either of two circumstances. If you don't know who the aggressor is, to prove who the aggressor was. And if you do know who the aggressor is, to prove your state of mind. That was the law of Montana at the time of this case. Regarding the petition, I would argue that I have not been at all inconsistent. The petition only allows me to state facts. It specifically says do not cite the case law or star law. And it doesn't require me to file a brief at the same time. And in this case, I had three days to meet my habeas deadline. So I was doing things very quickly. But regardless, we just have to give the state reasonable notice. We did that. We argued the exact same facts and the exact same law on the inconsistent determination issue. Thank you. Anything on the towing matter? Good morning once again. We've had an opportunity to caucus. I've spoken with my fire chief. And we believe we have some agreements in concept. There are many particulars we still have to work out. We would propose to notify the court in about a month if we're able to reach a resolution. We have very skilled arbitrators here. Do you know that? We have one in Seattle too. Do you want their help? Yes. It may prove helpful. So we'll do an order in the Senate for that. Okay. We'll recess until tomorrow morning. No, no. Until 1.30 this afternoon. All rise. This court is adjourned. This court is adjourned. This court is adjourned. This court is adjourned. This court is adjourned. This court is adjourned. This court is adjourned. This court is adjourned.
judges: Pregerson, Ferguson, Ikuta